Pablo A. LOZANO, Appellant,

v.

H.D. INDUSTRIES, INC., Appellee.

No. 08–96–00036–CV.

Court of Appeals of Texas,
El Paso.

June 26, 1997.

Richard Yetter, Bruce Yetter, El Paso, for Appellant.

James C. Jones, Grambling & Grambling, El Paso, for Appellee.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

### OPINION

McCLURE, Justice.

This is an appeal from a jury verdict in favor of the defendant below, H.D. Industries, Inc. (the Company), on a products liability claim brought in negligence and in strict liability by the plaintiff below, Pablo A. Lozano, (Lozano). With respect to the Company's pot-hole patching device called the "Pro–Patch Pothole Patcher," the jury found neither a defect in design, nor a defect in marketing (an assessment of the adequacy of safety warnings provided by a manufacturer). It further assigned no negligence and zero responsibility to the Company when it apportioned negligence and percentages of responsibility for Lozano's accident among Lozano, the Company, and the City of El Paso (the City). Lozano complains of charge error and insufficiency of the evidence. Finding harmless error in the charge and sufficient evidence to support the verdict, we affirm. However, because of the sufficiency challenges, we present a detailed evidentiary review.

### SUMMARY OF THE EVIDENCE

Lozano began working for the City of El Paso on October 31, 1988 as a laborer in the street department. His supervisor was Richard Campbell, the heavy equipment supervisor. One of Lozano's job responsibilities involved filling potholes. In 1990, the City began patching its potholes with a machine called the Pro–Patch Pothole Patcher which it purchased from the Company.

### The Pro–Patch Pothole Patcher

The Pro–Patch Pothole Patcher (the patcher) is connected to a truck. The truck's engine runs all the operations of the patcher; when the truck engine is turned off, the patcher is off and cannot operate. The patcher itself consists of a steel hopper, or "bind," with sides at 45 degree angles converging on a hole in the rear bottom of the bind. At the hole in the bind there is an auger, which moves either sand or asphalt into a hole or disperses sand in a pattern over the road. Above the auger is an agitator, which breaks up the sand or the asphalt in the bind so that it can pass through the hole and be distributed by the auger. The patcher has a heating mechanism that loosens the material inside the bind and keeps it usable; a second heating unit heats another compartment containing oil that mixes with gravel to form asphalt. A control panel on the outside of the bind controls the heating

units, the auger, and the agitator. The controls allow for use of the auger and the agitator at variable speeds. Inside the truck is another set of controls. Signs on the outside of the bind warn users not to enter the bind unless the truck engine is turned off. However, the designer of the machine, City workers, and expert witnesses all acknowledged that there can be circumstances in which a worker might enter the bind when the engine is turned off, primarily to loosen hardened sand.

### The Accident

The crew on which Lozano worked typically started its day at one of several corrals where the City stored its maintenance equipment. Lozano and his co-workers would take a truck with the patcher attached, preheat the bind by turning on the burner, spray the inside of the bind with diesel fuel, drive to a concrete company, and load hot asphalt mix into the bind quickly because the asphalt could harden. Once the mix hardened, Lozano and his co-workers would have to dig out the asphalt.

Lozano was injured on January 23, 1991, which was the first day that his crew had used the patcher for spreading sand. The weather was cold, rainy, and "kind of snowy." Because of these conditions, the workers were on 24–hour call for street maintenance. Richard Campbell, Lozano's supervisor, told Lozano's crew to come into work an hour early; Lozano arrived at the corral at 6 a.m. Campbell instructed Lozano and his co-worker, Roberto Cortez, to dig the hardened sand out of patcher unit number 49. Campbell himself worked with Lozano and Cortez as the third member of the crew.

When Lozano and Cortez began work, the patcher was filled with a sand and salt mixture up to the top of the bind. Lozano estimated the sand was approximately six feet deep. He testified that while he and his co-workers had attended the Company's training and orientation sessions on the use of the patcher, they had received no instruction concerning what to do if material hardened and got stuck in the bind. Lozano and Cortez climbed up into the bind with picks and shovels to dig out the sand. When Lozano got on top of the sand and salt mixture, it was hard, "just like a rock." While Lozano and Cortez were trying to loosen the sand and salt, Campbell ran the controls from inside the cab of the truck. Each time Lozano and Cortez loosened more sand, they would step out of the truck and yell to Campbell to try the power and see if the auger inside the bind would turn. Campbell did this four or five times, but Lozano felt no movement at the bottom of the bind.

Later in the day, Campbell assigned Carlos Rios to work with Lozano's crew. Rios was not trained to operate the patcher. He was a "fill-in" employee without a specific assignment who would work where he was needed. Lozano testified that he was loosening up sand and salt shortly before the accident. He and Cortez were moving toward the front of the bind when Lozano heard a loud noise. Lozano tried to get to the front of the bind to jump into the back of the truck. He then tried to jump out the side of the bind, but instead fell back inside. There were between two and three feet of salt and sand in the bind, enough to cover the agitator and the auger. As the sand descended to the bottom of the bind, Lozano's right leg got caught on the agitator and went around one or two times. Lozano testified that he could actually see his right foot coming out of the other side of the agitator. He screamed to Rios, who was in the cab of the truck, to put the agitator in reverse. Lozano pulled his leg out of the agitator with difficulty because "the bones were stuck to the agitator and down on bottom." Lozano then crawled out of the truck and jumped off. He was treated at the scene by EMS and transported to Thomason Hospital for treatment. The bones in his leg were exposed all the way down to the ankle. He believed he was going to die. Lozano underwent three surgeries and endured intolerable pain. He was released from Thomason after eight days and confined to "bed" for months.[1]

---

1. Lozano testified that he stayed in the living room on the couch for more than six months. The couch was preferable to his bed because the bed was too high, too soft, and too far. Thereafter, he "stayed in his room" for almost a year. When he began walking, he used crutches for

Lozano acknowledged on cross-examination that he understood he had to get out of the bind before the truck was turned on, and that Cortez had gotten out before the truck was turned on. Lozano admitted that he had not yet exited the bind when he yelled to Rios[2] to turn on the auger, explaining that he was accustomed to working with Campbell, who always waited for everyone to get out of the bind before starting the agitator. There may also have been some confusion as to whether Rios should have turned on the auger rather than the agitator which may have caused or aggravated Lozano's injuries.

At trial, Campbell testified that he had assigned Lozano and Cortez to unload the sand from the bind from rails that run along the sides of the bind, using long-handled shovels. He did not instruct them to unload the bind by getting inside it, nor did he see Cortez and Lozano get into the bind to remove the sand. He gave the order and then left the site to work elsewhere. Campbell expressed his opinion that Lozano could have gotten out of the bind before the power was turned on, and that Lozano should have used the controls on the side of the bind to turn the power off. Had he done so, the rotating equipment would not have run even when the truck was turned on. Campbell described these steps as "common sense." Campbell admitted that Rios was operating the controls when Lozano was injured; he could not remember if Rios had been trained on the patcher.

Cortez testified that in fact, Rios had not been trained to operate the patcher controls. He confirmed the testimony of Campbell and Lozano with respect to the hardened sand in the bind the day of the accident. He had crawled on top of the sand pile to dig it out, and remarked that the only way to remove the sand out was to climb inside the bind. He agreed with the description of the machinery inside the bind as an obvious hazard. He also confirmed that before Lozano had exited the bind, he told Rios to turn on the agitator. Echoing Campbell's testimony,

Cortez commented on Lozano's failure to use the controls on the outside of the bind to turn the power off before climbing inside.

Rios testified that at the time of the accident, he was a floater with the City working where he was needed. He acknowledged that had never received any training with the patcher before being asked to operate it on the day of the accident. He remembered that Lozano had called to him from the bind to start up the agitator, but he claimed to have asked Lozano if he were out of the way before starting up the machinery.

### Safety Warnings

Testimony adduced at trial established that prior to his accident, Lozano had received warnings from four sources concerning the danger of working inside the bind of the patcher while the truck engine was running:

- from the orientation provided by the Company;

- from the operating manual that accompanied the patcher;

- from his co-workers; and

- from the warning signs that appear on the machine itself.

### *The Orientation*

During the fall-winter of 1990, Lozano attended a three-day orientation program conducted by the Company on the operation of the patcher. Initially, he claimed that the only warning he received during the orientation was that he should not touch the bind area because it could get very hot. On cross-examination, however, he acknowledged that he had testified on deposition that the trainer had told the trainees that getting into the bind of the truck would be a "disaster," would be "very dangerous." James N. Foster, who conducted the orientation, testified that the trainees were warned never to be in the bind while the motor was on.

eight months and then a cane for a year and a half. At trial, he was using the cane occasionally. He continues to wear a leg brace for balance and support.

2. Lozano testified that at the time he yelled to the driver, he believed Campbell, not Rios, was at the controls.

## The Operating Manual

Harold Dillingham, the designer of the patcher and the owner of the Company, read to the jury from the operating manual: "Caution, never attempt to repair, lubricate or clean the machine while the truck—while the truck motor or P.T.O. is running. Shut all power supply off." Dr. Carroll Johnson, Lozano's expert witness, acknowledged that the manual cautioned workers to turn off all power supplies before cleaning, repairing, or lubricating the mechanisms inside the bind. Although Campbell testified that he was responsible for seeing that Lozano reviewed the manual and that to his knowledge, Lozano had reviewed it, Lozano denied ever seeing it and stated that to the best of his knowledge, no such manual existed.

## Verbal Warnings

Campbell testified that he never told Lozano to get in the bind, that Campbell recognized the dangers of getting into the bind, and that he specifically warned Lozano of the dangers of getting in the bind while the power was turned on. Dillingham testified that Campbell twice told Lozano not to get inside the hopper (bind) with the power supply on.

## Written Warnings

Warnings concerning the dangers of working in the bind with the power supply functioning also appeared on the machine itself. Dr. Johnson acknowledged that the patcher had a number of warning signs on it, including: "[R]otating equipment, keep hands and body away from inside asphalt hopper, stop machine and cut power supply before cleaning, oiling or repairing." Lozano claimed that he did not remember the warning decals on the side of the truck.

## Language Barrier

Lozano also raised the issue that the Company orientation, the manual, and the safety signs on the patcher all appear in English, whereas a majority of El Paso workers speak Spanish as their first language. Significantly, Lozano was not asked whether Spanish was his primary language, whether he could speak and understand English, whether he could read English, whether the instructors at the orientation session ensured the trainees could speak English, or whether he was unable to understand the training sessions or the warnings. We note, however, that he was able to testify in English without the aid of an interpreter. During repeated impeachment with his deposition testimony, Lozano was able to read from the written transcript what his prior testimony had been. And he was able to testify as to what the warning signs said, which were admittedly in English.

By contrast, both Cortez and Rios testified through an interpreter. Cortez stated that the training was provided in English, that he does not read English and that there were other workers who did not read English. Rios testified that he read the operating manual after the accident and that he can read about 70 percent of the English language.

Dr. Johnson observed that the patcher units sold to the City bore no warnings in Spanish, although bilingual warnings were "pretty much standard" on the border and standard on machines sold to Mexico. Campbell testified that many employees were "very uncomfortable in English" and had a difficult time understanding or reading English. Campbell spoke Spanish, however, and he conducted his supervisory meetings in English and Spanish. Dillingham testified that he makes accommodation for predominantly Spanish-speaking work forces by providing a bilingual trainer. He had specifically requested from the City that an interpreter be present at the training sessions. To the best of his knowledge, Campbell served as the interpreter. Lastly, Foster testified that he had ascertained that all the trainees could speak and read English during the orientation session. He claimed he worked with everyone individually and that he could speak a little Spanish. While we are concerned that in a bicultural community such as El Paso, an effort should be made to ensure that workers are provided with safety instruction in their primary language, our review of the record convinces us that Lozano was fluent in English.

## Design Defects

*Lozano's Expert*

Dr. Carroll Johnson had been an associate professor in the mechanical and industrial engineering department at the University of Texas at El Paso for seventeen years. He held a bachelors' degree in math from Baylor University, a masters' degree in industrial engineering from Texas A & M University, and a Ph.D. in industrial engineering from Texas A & M. Among other subjects, Dr. Johnson teaches a safety engineering course. He has consulted in the field of safety engineering with regard to rotating equipment such as industrial laundry equipment, rotating drums, screw conveyors, augers, asphalt machines, and sand spreaders. He was also experienced in machine-guarding equipment, which is designed to keep operators' hands out of machinery.

Dr. Johnson explained the so-called "hierarchy of safety design criteria" which establishes the following order of priorities:

● To design the hazard out of the machine.
● If it is impossible to design out the hazard, to control and isolate the hazard.
● If the hazard cannot be completely isolated, to provide training to the operator concerning the hazard.
● To ensure that adequate warnings have been provided concerning the hazards that could not be eliminated or isolated.

In Dr. Johnson's opinion, the primary "hazard point" of the patcher was the bind. It was foreseeable that a person would have to enter the bind from time to time to dislodge material. Once the operator was in the bind, he was exposed to an unsafe condition. The operator came into contact with both the agitator and the auger. The auger actually moved the material, once stirred by the agitator, to the port at the back of the patcher where the material was dislodged onto the street. While an ordinary, reasonably prudent person would avoid entering an empty bind because of the obvious hazard posed by the auger and agitator, the hazard would no longer be apparent if the bind were filled with three or more feet of sand. Dr. Johnson concluded that the patcher did not comply with the standards laid out in the National Safety Council Accident Prevention Handbook, although a reasonably prudent manufacturer would abide by those standards. He then recommended a number of safety devices that would have made the patcher a safer machine.

First, he recommended an "interlock device." When the doors on either side of the "V" shaped walls of the bind are open, an interlock device would make it impossible for the operator inside the truck to run the auger or agitator. Second, he recommended a safety or kill switch for the operators who removed material from the bind. Third, he suggested a jog mechanism, such as on a laundry dryer, which would allow an operator to start the agitator, but it would stop after less than a complete revolution. The patcher relied on hydraulic motors, and the jog mechanism would cut off fluids to the hydraulic engine and make it stop. Lastly, Dr. Johnson recommended a "lanyard switch," a rope that an operator could grab to trip a switch and stop the machine.

Of these safety mechanisms, Dr. Johnson believed that a jog mechanism and an interlock device would be the most important. In his opinion, the variable speed controls found on the outside of the patcher provided inadequate protection from accidents. He estimated that incorporating one or more of these three innovations would cost from $1,000 to $3,000. In critical testimony, Dr. Johnson suggested that one or more of these safety mechanisms was necessary for the safe operation of the patcher due to a fundamental design problem: The person in the cab of the truck could start the motor and the agitator without being able to see if anyone were in the bind. The fact that the auger and agitator could not run if the engine of the truck were turned off was therefore inadequate as a safety precaution. Reliance upon operators to ensure safety violates the safety design hierarchy. Any safety design should rely on the actions of individuals to the least extent possible. Johnson testified that although he knew of no other accidents like Lozano's, one could reasonably expect similar accidents unless safety devices were installed. The utility of the patcher

would not be compromised by any of the safety devices that he had suggested.

### The Company's Experts

### The Designer

The designer of the patcher and founder of the Company, Harold Dillingham, explained that H.D. Industries had a nationwide market, selling the machine to city, county, and state governments from New York to California. He emphasized that each machine had warning labels of various kinds, including a warning to cut off all power supplied before doing anything inside the bind. Two copies of the operating manual accompanied each patcher sold, and it contained clear warnings. Both the auger and the agitator operated on a variable speed mechanism, which the operator controlled. Shutting off the truck engine shut off all power to the patcher.

Dillingham disagreed with Dr. Carroll Johnson's safety recommendations. An interlock system that would shut down the power to the agitator and auger when the doors of the bind were open would require workers to use an override switch to get the machine operating again. The override would allow an operator to bypass the interlock whether or not the doors were open. The "jog mode" was unnecessary because controls on the outside allowed for variable power flow; the operator could use these controls to turn the power all the way off.

With respect to a lanyard switch, Dillingham testified that such a mechanism would be inside the bind and would get covered in asphalt. A box covering the switch would not solve this problem because the box itself would get covered with asphalt. Either way, the switch would be useless. Further, Dillingham suggested that a switch inside the bind would be an invitation to get inside the bind, and it was important to keep people out of the bind. Dillingham told the jury that there were 225 patchers in operation, and no other accidents had been reported. He acknowledged that people would sometimes need to go into the bind, but if the machine were operated properly, only maintenance crews who greased carrier bearings would need to climb inside. Dillingham admitted

that the Company put the warning signs on the machine because the manufacturer had foreseen workers climbing into the bind. He had encountered hardening sand and claimed that the solution was to use sand that did not have a high limestone content.

### The Mechanical Engineer

Hugh Arant, a mechanical and environmental engineer, testified that there was absolutely no reason for an operator to be in the bind when the power was on, and that the machine was specifically designed so that this was unnecessary. He also commented on the safety features recommended by Dr. Johnson. In Arant's opinion, the interlock system made no sense because the doors on the bind were hydraulically powered. If the interlock were to cut off the power every time the doors were opened, there would be no way to close the doors because the power necessary to close them had been disconnected. In order to close the doors, a bypass switch would be necessary to allow the power to turn back on. In effect, the operator would have a bypass switch to override the interlock device itself such that the operator would still be in control of the safety of the machine. The jog mode was unnecessary because the power to the auger and agitator was already on a variable speed control. A lanyard switch inside the bind was dangerous because it would invite operators to go into the bind on a routine basis. The only safe way for someone to get inside the bind was to turn the engine off. Any other safety device could be circumvented.

### The Architectural Engineer

Finally, Joe Shepard, an architectural engineer with experience in electrical safety, fire safety, and human factor engineering, testified that the patcher was an "impressive piece of equipment." He considered the safety features to be adequate as designed. The training provided by the Company and the warning signs posted prominently on the machine served to protect workers from hazards. The warning signs meet safety standards promulgated by OSHA. With respect to the mechanical parts inside the bind, if the truck were turned off and the keys were in

the operator's pocket, there was no way for the power to turn on. This was the single most important guarantee of safety. The operating manual accompanying the machine contained all the safety warnings needed.

Shepherd criticized the safety features recommended by Dr. Johnson. The jog switch was unnecessary because the controls external to the bind were of variable speed. The interlock device and the lanyard switch both encouraged people to get into the bind with the power on. No one should be in a container with 45 degree walls coated with diesel and a rotating screw conveyor and agitator at the bottom. Even if the moving machinery in the bind were obscured by hardened sand, it should still be considered an obvious hazard to be in the bind with the power turned on.

## RELEVANT PRODUCTS LIABILITY PRINCIPLES

In order to address Lozano's arguments, we must first examine products liability principles in strict liability and negligence. We begin with the recent pronouncements of the Texas Supreme Court in *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379 (Tex.1995). There, the operator of a front-end loader from which the "rollover protective structure" had been removed was injured in a collision. The jury awarded the plaintiff both actual and punitive damages. The Court of Appeals affirmed the award of actual damages, but reversed as to punitive damages. The Supreme Court reversed and rendered judgment on behalf of the defendants.

### Strict Products Liability

■ With respect to strict products liability, the *Shears* Court explained that Texas adheres to the standards articulated in RESTATEMENT (SECOND) OF TORTS, § 402A(1)(1965): A party is liable for products sold "in a defective condition unreasonably dangerous to the user or consumer." The unreasonably dangerous condition can arise from a defective condition in *design, manufacturing*, or *marketing*. *Shears*, 911 S.W.2d at 382, *citing Turner v. General Motors Corp.*, 584 S.W.2d 844, 847 (Tex.1979).

*Design Defects*

■ The *Shears* Court held that a manufacturer can be held strictly liable for design defects that render the product unreasonably dangerous, even if the defect is readily apparent. *Shears*, 911 S.W.2d at 383. Whether a product has a design defect should be evaluated in light of the economic and scientific feasibility of safer alternatives. *Shears*, 911 S.W.2d at 384, *citing Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex.1980). The feasibility of a proposed design alternative is one factor to be considered when balancing the utility of a product against its risks. As a matter of law, a product cannot be found unreasonably dangerous if no safer design alternatives exist. *Shears*, 911 S.W.2d at 384; *Boatland*, 609 S.W.2d at 748. Texas' products liability statute establishes the elements that a plaintiff must demonstrate in a products liability action alleging design defect. TEX.CIV.PRAC. & REM.CODE ANN. § 82.005 (Vernon 1997) provides in part:

§ 82.005. **Design Defects**

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:

(1) there was a safer alternative design; and

(2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.

(b) In this section, 'safer alternative design' means a product design other than the one actually used that in reasonable probability:

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

Lozano's complaints that the patcher suffered a fundamental design defect (the per-

son in the cab of the truck could start the motor and agitator without being able to see if anyone were in the bind) and that one or more safety mechanisms as described by Dr. Johnson were necessary for the safe operation of the patcher, fall into this category.

### Marketing Defects

The failure to warn constitutes a marketing defect in strict products liability. A party can be liable "if the lack of adequate warnings or instructions renders an otherwise adequate product unreasonably dangerous." *Shears,* 911 S.W.2d at 382, *citing Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 377 (Tex.1984). A party has no duty to warn of obvious risks, since a readily apparent danger serves the same function as a warning. *Id.* Whether a danger is open and obvious as a matter of law is an objective question for the court to determine. *Shears,* 911 S.W.2d at 383. Where the danger is not obvious, a warning must be:

- designed so that it can reasonably be expected to catch the attention of the consumer;
- comprehensible and give a fair indication of the specific risks involved with the product; and
- of an intensity justified by the magnitude of the risk.

*Bituminous Casualty Corporation v. Black and Decker Manufacturing Co.,* 518 S.W.2d 868, 872–73 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). In the present case, we would characterize the contested issues of warning labels on the patcher and warnings published in the operating manual accompanying the patcher, as alleged marketing defects in strict products liability.

### Negligence

Whereas strict products liability focuses on whether the product was sold in a defective condition unreasonably dangerous to the user, negligence focuses on the supplier's standard of care. In strict liability, the care taken by the supplier is irrelevant if the product is found unreasonably dangerous. Negligence, by contrast, focuses on the acts of the manufacturer and asks whether it exercised ordinary care in design and pro-

duction. *Shears,* 911 S.W.2d at 384, *citing Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867, 871 (Tex.1978).

In addition to the standard of care exercised by the supplier in design and production, negligence in products liability inquires whether the supplier exercised ordinary care in the marketing of the allegedly dangerous product. In *Shears,* the plaintiff alleged that the defendant's salesperson was aware that the plaintiff's employer would have to remove the safety device, "the rollover protective structure," from the front loader on which plaintiff was injured, and that the salesman even encouraged the employer to remove the safety device. This negligence claim focused on the duty of care exercised in the marketing of the allegedly dangerous product. Similarly, Lozano alleges that the Company provided inadequate safety orientation with the patcher: the orientation was too short, no instruction was provided in Spanish, and the safety warnings were inadequate. Lozano's allegations concerning the orientation program, included in the sale price of the patcher, constitute negligent marketing allegations.

With these products liability principles in mind, we address the issues raised on appeal.

### INCLUSION OF THE CITY IN THE JURY CHARGE

Lozano alleges that the inclusion of the City in Question Numbers 3 and 4 as a party to which the jury assigned negligence and a percentage of responsibility for the accident constituted harmful error. He argues that Texas law requires employers providing workers compensation benefits to an employee-plaintiff prior to trial to be excluded from the charge, and that the presence of the City confused the jury. This argument poses a difficult question given the current state of Texas law. We conclude that the trial court erred by including the City in the charge but that in light of the jury's other responses, the error was not reasonably calculated to cause and probably did not cause the rendition of an improper judgment. TEX.R.APP.P. 184(b).

### Relevant Procedural History

The trial court granted the Company's motions for directed verdict on the causes of action pleaded under U.C.C. § 2–314 and § 2–315, implied warranty of merchantability and implied warranty of merchantability for a specific purpose. The remaining causes of action were strict products liability and products liability negligence.

As reflected in paragraph five of Lozano's First Amended Original Petition, the design defect claim in strict liability alleged the necessity of a number of feasible and affordable safety devices to prevent foreseeable injuries arising from contact with the auger and agitator inside the bind. Further, Lozano alleged that the patcher was defectively designed because the operator of the truck could not see whether someone was inside the bind. The strict liability marketing defect claim focused on whether inadequacies in the safety warnings provided in the operating manual, safety warnings affixed to the patcher itself, and safety warnings provided in the orientation sessions rendered the patcher unreasonably dangerous.

As reflected in paragraph six of the amended petition, the negligent design claim alleged that the Company violated the applicable standard of care by failing to design the patcher according to National Safety Council guidelines, and failing to incorporate safety devices into the design of the patcher. The negligent marketing claim focused on the Company's alleged failure to provide adequate safety warnings, in English and in Spanish, in the orientation program that was included as part of the sale price of the patcher.

### The Charge As Submitted

The trial court submitted the following questions to the jury:

### QUESTION NUMBER 1:

Was there a design defect in the Pro-patch Pothole Patcher at the time it left the possession of H.D. Industries that was a producing cause of the occurrence in question?

A 'design defect' is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.

This question conforms to Texas Model Jury Charge Question PJC 71.04. The jury answered this question "no." We note that this question addresses Lozano's strict products liability theory with regard to design defect, as contemplated by RESTATEMENT (SECOND) OF TORTS, § 402A(1)(1965). *See* 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.04 (1990). Under the strict liability standard, the Company could be held liable even if it had discharged its duty to exercise ordinary care as a manufacturer. Therefore, if the jury found there were no design defect under the more stringent strict liability standard, one would expect that this finding would also require a negative finding on a negligence question with respect to design defect.

### QUESTION NUMBER 2:

Was there a defect in the marketing of the Pro Patch Pothole Patcher at the time it left the possession of H.D. Industries that was a producing cause of the occurrence in question?

A 'marketing defect' with respect to the product means the failure to give adequate warnings of the product's dangers that were known or by the application of reasonable human skill and foresight should have been known or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

'Adequate' warnings and instructions means warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

An 'unreasonably dangerous' product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

This question and accompanying definitions conform to Texas Pattern Jury Charge PJC 71.06. The jury answered "no." Like Question Number One, this question is intended to encompass Lozano's failure to warn claim in strict products liability. As indicated by the definitions, a marketing defect can include a failure to provide adequate warnings or instructions. Moreover, the seller's duty "to warn and instruct for safe use in connection with marketing a product is determined by the dangers inherent in the product or associated with its foreseeable use." *See* 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.06. We have characterized the alleged failure to provide adequate safety warnings in the operating manual and those affixed to the patcher itself as a strict products liability claim. Further, we have characterized the alleged failure to provide adequate safety instruction to City employees as a negligence claim. Because the jury answered "no" to Question Number Two when asked whether the Company was responsible for a marketing defect under the more stringent strict liability standard, and because Question Number Two encompasses both *warnings* and *instructions,* one would anticipate that the jury's negative answer to this question would preclude a finding that the Company had been negligent in its marketing of the patcher.

### QUESTION NUMBER 3:

Did the negligence, if any, of those named below proximately cause the occurrence in question?

Answer 'Yes' or 'No.'

| | | |
|---|---|---|
| A. | Pablo Lozano | Yes |
| B. | H.D. Industries | No |
| C. | City of El Paso | Yes |

The jury answered that the negligence of Lozano and the City caused the accident, and that the Company was not negligent.

If, in answer to Questions 1 and 2 and 3, you have found that more than one of the parties' acts, omissions, or products caused the occurrence, then answer Question 4. Otherwise, do not answer Question 4.

The percentages you find must total 100 percent. The percentage of causation attributable to a person or product is not necessarily measured by the number of acts, omissions, or product defects found.

### QUESTION NUMBER 4:

For each person or product found by you to have caused the occurrence, find the percentage caused by—

| | | | |
|---|---|---|---|
| A. | H.D. Industries | –0– | % |
| B. | Pablo A. Lozano | 25 | % |
| C. | City of El Paso | 75 | % |
| | Total | 100% | |

This question corresponds to Texas Pattern Jury Charge Question PJC 71.12. The jury responded that H.D. Industries was 0 percent negligent, Pablo A. Lozano was 25 percent negligent, and the City of El Paso was 75 percent negligent. Question Number Five assigned dollar amounts for various forms of damages suffered by the plaintiff which totaled $275,000.

### Is the City a "Settling Person"?

The Texas Comparative Responsibility Act requires as a general principle that all parties who may have contributed to the accident for which damages are sought should be considered by the jury when it assigns percentages of responsibility. Specifically, TEX.CIV.PRAC. & REM.CODE ANN. § 33.003(3)(Vernon 1997) provides that parties who have settled should be considered by the jury for apportionment of damages:

§ 33.003. **Determination of Percentage of Responsibility**

The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent

act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1) each claimant;

(2) each defendant;

*(3) each settling person;* and

(4) each responsible third party who has been joined under Section 33.004. [Emphasis added].

*See also Duncan v. Cessna Aircraft Company,* 665 S.W.2d 414, 427 (Tex.1984). Further, TEX.CIV.PRAC. & REM.CODE ANN. § 33.011(5) defines a "settling person" as one

[W]ho at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability pursuant to the provisions of Section 33.001 with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought.

The Company asserts that the City should be considered a "settling person." We disagree. Lozano received benefits from the City, not pursuant to the provisions of the Texas Comparative Responsibility Act, but rather under the Texas Workers' Compensation Act. TEX. LAB.CODE ANN. §§ 401.001–506.001 (Vernon 1996). The determination of an injured employee's eligibility for workers' compensation benefits does not hinge on the comparative assignment of responsibility for the accident, but instead on the employee's ability to establish status as an employee in the course and scope of employment when the accident occurred. *See e.g.,* TEX.LAB.CODE ANN. § 401.012.

#### Charge Error

The more general question—whether the trial court erred by including the City in the question assigning negligence and percentages of responsibility to the parties—poses a more difficult question still. Prior to the passage of the current Comparative Responsibility Act, the Supreme Court had held that employers paying workers' compensation

benefits constituted an exception to the general rule that all parties who may have contributed to a claimant's injuries be included in the question assigning percentages of responsibility. In *Varela v. American Petrofina Company of Texas, Inc.,* 658 S.W.2d 561 (Tex.1983), the Court evaluated a case in which a carpenter sued the owner of a construction project for injuries the carpenter sustained when he slipped and fell on the job. The trial court submitted to the jury a question requiring the assignment of percentages of responsibility to the carpenter, his employer, and the owner of the project. The Court determined that an employer's negligence may not be considered in a third-party negligence action brought by an employee arising out of an accidental injury covered by workers' compensation insurance. *Varela,* 658 S.W.2d at 561–62. Indeed, the Court held that the Texas Workers' Compensation Act[3] was an exception to joint tortfeasor liability under TEX.REV.CIV.STAT.ANN. art. 2212a[amended and recodified as TEX.CIV. PRAC. & REM.CODE ANN. § 33.011(5) ]. The Court reversed a judgment for the amount of damages found by the jury reduced by the proportion of negligence of both the employer and the employee, and rendered judgment for the employee for the total amount of damages reduced only by the proportion of the employee's negligence. Submission of a jury issue including an apportionment of negligence to the employer was clearly harmful error since the jury assigned 43 percent responsibility to the defendant project owner, and 42 percent responsibility to the employer.

The Supreme Court revisited the problem of requiring a jury to assess the responsibility of an employer covered by workers' compensation in *Dresser Industries, Inc. v. Lee,* 880 S.W.2d 750 (Tex.1993). There, the plaintiff contracted silicosis after working for eight years in a foundry in which silicone dust was used to make pipes. He received workers' compensation from his employer and then sued the manufacturer of the silicone. There was strong evidence to suggest

---

**3.** Formerly TEX.REV.CIV.STAT.ANN. art. 8306, § 3a (amended and recodified as TEX.LAB.CODE ANN. § 406.034).

**318**

that the employer's lax safety and training policies caused the debilitating injury. The issue presented was the extent to which the *Varela* holding excluded a jury's consideration of a subscribing employer's responsibility for an accident. *Dresser* did not overrule *Varela*, but limited it to the specific fact situation in which a trial court requires a jury to assign a percentage of responsibility to the subscribing employer. The *Dresser* Court found that a third-party defendant was entitled to present evidence of the subscribing employer's negligence during trial, and was also entitled to a jury question that asked whether the employer's conduct was the sole proximate cause of the injury. *Dresser,* 880 S.W.2d at 753.

The decision in *Dresser* is problematic because the logic used to justify a jury question asking whether the subscribing employer's conduct was the sole proximate cause of the injury would also support the very type of jury question ruled out by *Varela:*

> A defendant is entitled to try to convince the jury that not only did it *not* cause plaintiff's injuries, but someone else *did.* ... With no one allowed to show what part the employer's conduct played, the jury would be left to wonder whether anyone other than the defendant *could* have caused plaintiff's injuries.

*Dresser,* 880 S.W.2d at 753. The Court appears to have left little justification for retaining the holding in *Varela* other than legislative intent.

■ Despite the ambiguous nature of the opinion, we read *Dresser* to hold that *Varela* prohibits jury questions requiring an assignment of a percentage of responsibility to an employer who subscribes to workers' compensation because they violate the intent of the Comparative Responsibility Act and the Workers' Compensation Act read *in pari materia.* However, a third-party defendant is entitled to submit evidence concerning the negligence of a subscribing employer, and is also entitled to a jury question that asks whether the subscribing employer's conduct constituted the sole proximate cause of the accident. *Varela* and *Dresser* can be harmonized if the third-party defendant is limited to a sole-proximate-cause-type question.

If a jury answered "yes" with respect to a subscribing employer, the joint and several liability and contribution provisions of the Comparative Responsibility Act, Tex.Civ. Prac. & Rem.Code Ann. §§ 33.013 and 33.015, would not come into play.

■ We conclude that the Company was entitled to a jury question as to whether the conduct of the City constituted the sole proximate cause of Lozano's injuries, but submission of questions requiring the assignment of negligence and a percentage of responsibility to the subscribing employer was error.

### Harm Analysis

■ In order to reverse the judgment, we must determine that the error was "reasonably calculated to cause and probably did cause the rendition of an improper judgment." Tex.R.App.P. 184(b). Submission of an improper jury question can be harmless error if the jury's answers to other questions render it immaterial. *Boatland,* 609 S.W.2d at 750. If an answer to a jury question can be found elsewhere in the verdict, or if the answer to a question cannot alter the effect of the verdict, then a jury question is considered irrelevant. *Fleet v. Fleet,* 711 S.W.2d 1, 2 (Tex.1986). Submission of an immaterial jury question can nevertheless constitute harmful error if it confused or misled the jury. *Bailey,* 609 S.W.2d at 750. In determining whether a question confused or misled the jury, the reviewing court considers the "probable effect on the minds of the jury in the light of the charge as a whole." *Texas Employers Ins. Ass'n v. McKay,* 146 Tex. 569, 210 S.W.2d 147, 149 (1948). In the present case, we conclude on the basis of the jurors' responses to the other questions that the erroneous questions were immaterial, and that they did not confuse or mislead the jury.

In *City of Brownsville v. Alvarado,* 897 S.W.2d 750 (Tex.1995), the Supreme Court addressed the problem of harmless error in the context of improperly submitted jury questions. A teenager committed suicide in his Brownsville jail cell after being arrested for drunken driving. The trial court submitted three questions to the jury. First, did

the negligence of the City of Brownsville, if any, proximately cause Alvarado's death; second, did the negligent or intentional conduct of Alvarado proximately cause his death; third, what percentage of negligence was attributable to the City and what percentage was attributable to Alvarado. The second question was improperly submitted in violation of Tex.Civ.Prac. & Rem.Code Ann. § 93.001, which prohibits the use of suicide as a defense if the suicide was caused in whole or in part by the City's violation of a legal standard. The jury answered the first question that the City of Brownsville was not negligent in its supervision of Alvarado. The Supreme Court found that the jury's assignment of zero negligence to the City rendered harmless the error committed by the trial court in submitting Alvarado's name in the questions assigning negligence and percentages of responsibility. The Court noted that an affirmative or negative answer to the second question would be irrelevant once the City was exonerated of any negligence. Moreover, the Court found the issues and the charge to be clear: the jury was asked only to assign responsibility for a single incident that was never disputed. *Alvarado,* 897 S.W.2d at 753.

The present case involved a greater number of parties and issues than did *Alvarado,* and the potential for jury confusion as a result of improperly submitted questions was greater. If there were logical inconsistencies between the jury's responses to Question Numbers One and Two as compared to Question Numbers Three and Four, we would conclude that the trial court's clear error in submitting the City as a party was harmful. Moreover, if the charge reflected that the jury had assigned the Company some responsibility and some percentage of negligence, we would conclude that the presence of the City in Question Numbers Three and Four had skewed the assignment of responsibility for the accident. However, neither these nor other indications of jury confusion can be ascertained from the charge. The jury's answers to Question Numbers One and Two are completely consistent with its answers to Question Numbers Three and Four. Moreover, the negative answers to the first two questions suggest that the jury had already made its decision before it reached the wrongly submitted questions; therefore, we cannot conclude that the City's presence was outcome determinative.

Even given these indications that the jury was not confused, we would still find harm if the jury had assigned some negligence to the Company in Question Number Three, and some percentage of responsibility to the Company in Question Number Four. Any assignment of responsibility to the Company would raise the possibility that the City's presence had skewed the result. However, the jury assigned no negligence, and zero responsibility, to the Company. As the Texas Supreme Court noted in *Alvarado,* the jury's responses with respect to the wrongly submitted party were irrelevant in light of the fact that the jury had already assigned no responsibility to the defendant. We conclude that the error was harmless. *See also Bailey,* 609 S.W.2d at 750.

## SUFFICIENCY OF THE EVIDENCE

### Legal Sufficiency

■■■■ Lozano next asserts that the evidence established as a matter of law the existence of design and marketing defects. A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. There are basically two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik, Inc.,* 726 S.W.2d 207 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.).

■■■■ The standard of review requires a determination by the appellate court as to whether, considering only the evidence and inferences that support the findings in a light most favorable to the verdict and disregarding all evidence and inferences to the con-

trary, there is any probative evidence which supports the finding. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670, 672 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Southwest Craft Center v. Heilner,* 670 S.W.2d 651, 653 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Terminix International, Inc. v. Lucci,* 670 S.W.2d 657, 662 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). A "no evidence" point of error may be sustained only when the record discloses:

- a complete absence of evidence of a vital fact;

- the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact;

- the evidence offered to prove a vital fact is no more than a mere scintilla; or

- the evidence establishes conclusively the opposite of a vital fact.

*Neily v. Aaron,* 724 S.W.2d 908 (Tex.App.—Fort Worth 1987, no writ).

Lozano's argument falls within the second category. He complains that expert testimony concerning the design of the patcher should be disregarded as incompetent hearsay unless the proponent had the witness designated as an expert. He urges that the testimony of his expert, Dr. Carroll Johnson, should be given exclusive weight on review because only Dr. Johnson was designated by the trial court as an expert.

■ The Company offered the testimony of its owner/designer, a mechanical engineer, and an architectural/safety engineer. While the Company never asked that any of these witnesses be designated as experts on the safety design of machines such as the patcher, a review of the record reveals that Lozano never objected to any of the testimony on the basis that it was speculative hearsay or irrelevant, or that the witnesses lacked appropriate expertise. Rather, Lozano chose to impeach the qualifications of the respective witnesses during cross-examination and to allow the jury to decide whether the testimony had been credible. Because he made no objection to the testimony concerning the alleged design defects, error is waived.

From witnesses Dillingham, Arant, and Shepard, the jury heard testimony that in ten years of producing the Pro–Patch Pothole Patcher and with over 220 units currently in operation, no other accidents had ever occurred; that the speed of the auger and agitator can be varied by the controls external to the bind; that the heating mechanism makes it unnecessary to break up hardened sand or asphalt manually; that if sand or asphalt ever needs to be broken up, this procedure can be performed with shovels on rails from the outside of the bind; that if anyone should need to enter the bind, it is safe to do so as long as the truck is turned off; that the orientation program stressed that any repair or cleaning work must be done with the truck turned off; that warnings in the operating manual accompanying the pothole patcher declare that the engine must be turned off before any work involving the bind is performed; and that warning labels on the truck and the bind warn workers never to work on the bind unless the truck is turned off. Further, all three of these witnesses expressed their belief that the safety measures suggested by Lozano's expert were unnecessary and would be more dangerous in some respects than the current design of the machine. Both engineers testifying for the Company stated they considered the machine's design to be safe.

■ As to the adequacy of safety warnings arising from the defective marketing claim, the jury heard testimony that the operating manual indicated no one should be in the bind during its operation, that warnings to this effect appeared on the machine itself, and that this warning was specifically reviewed during orientation. We conclude that more than a scintilla of evidence exists to support the jury's answers.

### Factual Sufficiency

■ "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. There are two traditional factual sufficiency complaints. When the party having the burden of proof complains of an unfavorable finding, the complaint should allege that the

findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" challenge is appropriate when the party without the burden of proof on an issue complains of fact findings. *Neily v. Aaron,* 724 S.W.2d 908 (Tex.App.—Fort Worth 1987, no writ). Lozano's complaints fall within the first category.

The standard of review for factual insufficiency is set forth in *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. We cannot substitute our own conclusions for those of the jury, nor may we interfere with the jury's resolution of evidentiary conflicts, or to pass on the weight or credibility of the witnesses' testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (Tex.1951); *Southwest Airlines Co. v. Jaeger,* 867 S.W.2d 824, 829–30 (Tex. App.—El Paso 1993, writ denied). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508 (1947); *Tseo v. Midland American Bank,* 893 S.W.2d 23, 26 (Tex.App.—El Paso 1994, writ denied); *Hallmark v. Hand,* 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied). If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Tseo,* 893 S.W.2d at 26; *Texas Tech University Health Sciences Center v. Apodaca,* 876 S.W.2d 402, 412 (Tex.App.—El Paso 1994, writ denied).

We have meticulously detailed the evidence presented to the jury. We pause here to note that the jury heard testimony concerning Lozano's own negligence in calling to Rios to start the agitator and/or auger while Lozano was still inside the bind. The jury heard conflicting testimony concerning the safety of the patcher as currently designed, including testimony that the operating manual, the orientation provided by the Company, and signs on the machine itself all warned against climbing into the bind while the power was turned on. Further, with respect to the design defect claim, there was conflicting evidence concerning the efficacy and workability of the proposed safety mechanisms described by Lozano's expert. Inasmuch as there was extensive, albeit conflicting, testimony on all issues related to design defect and adequacy of warnings, we cannot conclude that the verdict is against the great weight and preponderance of the evidence.

We overrule Points of Error Nos. One through Five and affirm the judgment.