TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00322-CV







Darrell Koehn and Joanne Koehn, Appellants


v.


CST Drilling Fluids, Inc. Individually and d/b/a Starvin Marvin, Appellee








FROM THE DISTRICT COURT OF LEE COUNTY, 335TH JUDICIAL DISTRICT

NO. 11, 521, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 Darrell Koehn and Joanne Koehn appeal from a take-nothing judgment entered
against them in their suit to recover for personal injuries and loss of consortium. Mr. Koehn
allegedly sustained back injuries when he was struck by heavy equipment during a pickup-and-laydown operation on the floor of a drilling rig. The Koehns sued CST Drilling Fluids, Inc. d/b/a
Starvin Marvin ("CST"), the operator of the pickup-and-laydown machine used in the operation. 
The jury failed to find negligence on the part of CST, finding instead that Mr. Koehn's negligence
was the proximate cause of the accident. In two issues, the Koehns contend that there is factually
insufficient evidence to support the jury's findings. We will affirm the district court's judgment.

BACKGROUND


 Mr. Koehn worked as a floor hand for Key Energy Group ("Key"), which had hired
him to work on a drilling crew in early September 1997. (1) On the night of November 9, 1997, the
drilling crew was engaged in a pickup-and-laydown operation on a well site. A pickup-and-laydown
operation consists of transporting joints of pipe from racks on the ground to the rig floor, twenty feet
above, and then running the drilling pipe into a well hole. On that occasion, CST had been hired as
the pickup-and-laydown company. CST's operators were responsible for lifting the pipe to the rig
floor by placing the joints of pipe into a trough that was moved up on cables using a motorized
wench called a pickup-and-laydown machine. The wench was set up using a "snub pole," which is
installed in a hole in the rig floor called the "mouse hole." Once raised to the rig floor, the pipe is
secured by latching "elevators" around it. The elevators are used to transport the pipe to the top of
the derrick so that the bottom of the pipe segment can be connected to the joint of pipe already in
the well hole.

 On the night of the incident, Mr. Koehn stood on the rig floor to latch the elevators
around the pipe once it reached the rig floor. According to Mr. Koehn, the CST pickup-and-laydown
machine operator raised the pipe in an erratic manner, often "gassing" or "throttling" the trough up
to the rig floor; after a number of such instances, a joint of pipe struck him in the shoulder as he
attempted to latch it. As a result, Mr. Koehn suffered injuries to his back that eventually required
surgery and forced him to leave the oilfield workplace. The other members of the drilling
crew--Robert San Miguel, Thomas Rochester, and Rick Benson--witnessed the incident. (2) The
identity of the CST operator on the night of the incident has never been precisely established. There
were no other eyewitnesses to the incident.

 In November 1999, the Koehns sued both CST and Key; their suit against Key was
eventually dismissed because Key subscribed to workers' compensation insurance. The Koehns'
negligence suit against CST was tried to a jury in December 2001. CST pleaded an affirmative
defense, arguing that the accident was proximately caused in whole or in part by Mr. Koehn's own
negligence, or solely caused by the negligence of Key. The jury heard testimony regarding the 
incident from Mr. Koehn, the drilling crew witnesses, the rig supervisor, and several experts. The
jury also heard testimony relating to the severity and consequences of Mr. Koehn's back injuries. 
At the conclusion of trial, CST was precluded from submitting a jury question regarding Key's
conduct because Key provided workers' compensation benefits to Mr. Koehn prior to trial. See
Texas Workers' Compensation Act, Tex. Lab. Code Ann. § 406.034 (West 1996); Varela v.
American Petrofina Co. of Tex., 658 S.W.2d 561, 562 (Tex. 1983). Rather, CST presented evidence
of Key's negligence during the trial and received an instruction on "sole proximate cause." See
Dresser Indus., Inc. v. Lee, 880 S.W.2d 750, 753 (Tex. 1993). The jury received instructions on how
to answer the proximate cause question: they could answer "yes" or "no" for CST and Darrell
Koehn, but if the jury considered Key to be the sole proximate cause, then they were required to
answer "no" as to both CST and Darrell Koehn. The jury answered "no" as to CST, and "yes" as
to Mr. Koehn. The district court entered take-nothing judgment against the plaintiffs and later
denied their motion for new trial. This appeal followed.


DISCUSSION


Challenge to the Jury's Failure to Find Negligence

 In their first issue, the Koehns appeal the district court's denial of their motion for
new trial by challenging the factual sufficiency of the evidence supporting the jury's failure to find
that CST's negligence proximately caused Mr. Koehn's injuries. A challenge to the factual
sufficiency of the evidence requires the party with the burden of proof to establish on appeal that the
non-finding is contrary to the great weight and preponderance of the evidence. Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex. 2001). We may not reverse merely because we conclude that the
evidence preponderates toward an affirmative answer. See Waring v. Wommack, 945 S.W.2d 889,
893 (Tex. App.--Austin 1997, no pet.) (citing Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex.
1988)). Rather, we will reverse the judgment and remand for a new trial only if, after reviewing all
the evidence in the record, we conclude that the failure to find is so contrary to the overwhelming
weight of the evidence as to be clearly wrong or manifestly unjust. Dow Chem., 46 S.W.3d at 242;
Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986). Here, the jury was not convinced by a preponderance of evidence that CST's
negligence proximately caused Mr. Koehn's injuries; having reviewed all of the evidence, we find
it factually sufficient to support the jury's finding.

 Mr. Koehn testified that on the night of the incident he attempted to latch joints of
pipe to the elevators as they were raised to the rig floor in the trough, but had trouble doing so
because the CST operator worked the pickup-and-laydown machine in an erratic manner. Mr. Koehn
described how Tommy Rochester, also a floor hand on the drilling crew, gave hand signals to the
CST operator so as to slowly and smoothly ease the pipe into the elevator. However, the CST
operator allegedly raised the trough too quickly, causing the trough and pipe to hit the snub pole. 
Then the CST operator throttled the trough into the elevator while Mr. Koehn attempted to make the
latch. According to Mr. Koehn's testimony on direct examination, this throttling into the elevator
occurred approximately eight to ten instances, each time causing the elevator to jar him backwards. 
Robert San Miguel, the "driller" on the crew, allegedly shut down the operation and spoke to the
CST operator before Mr. Koehn was physically hit, but after he had been jarred by the elevator. San
Miguel also "flagged the dead line" to provide a visual aid to the CST operator indicating how far
to raise the elevator before stopping. Mr. Koehn testified that after the operation resumed, the trough
was throttled into the elevator so erratically that the pipe finally struck Mr. Koehn across the chest,
knocking him to the rig floor.

 On cross-examination, CST sought to contradict Mr. Koehn with his deposition
testimony from two years earlier. For example, Mr. Koehn testified in his deposition that the trough
hit the elevator latches, but agreed on cross-examination that the trough can physically only hit the
snub pole. He testified in his deposition that the trough is raised in one continuous motion into the
elevator latches. Mr. Koehn also read from his deposition, where he had testified that on the
occasion in question no one on the rig floor signaled or flagged the CST operator and that the pipe
never actually physically hit him. Mr. Koehn admitted on cross-examination that he rarely attended
safety meetings; he admitted that signaling the pickup-and-laydown operator would be the safe thing
to do, but that, on the night of the incident, he was jarred up to maybe ten times before the operation
was shut down so that guidance could be provided to the CST operator.

 The jury heard deposition testimony from the members of the drilling crew, the only
eyewitnesses to the incident. Tommy Rochester, the motor man, testified that the CST operator was
"running" the trough "up in there" so that the elevators were pushed back, thereby causing Mr.
Koehn to be pushed back. According to Rochester, San Miguel, the driller, shut the rig down and
informed the CST operator that he needed to be flagged in. Rochester never testified that Mr. Koehn
was knocked down after San Miguel spoke with the CST operator; rather, he testified that the CST
operator was subject to the control of the driller and the tool pusher and that before Mr. Koehn was
injured no one had talked to the CST operator. Rochester also testified that Mr. Koehn and San
Miguel would often arrive at the safety meetings, but would sign their names and leave without
watching the safety videotape. 

 The other floor hand, Rick Benson, testified that he witnessed Mr. Koehn get struck
with the pipe. Benson recalled that Rochester had "hollered" at the CST operator when he did not
operate at normal speeds and "gassed it too much," causing the trough to ram into Mr. Koehn and
spin him around. Benson did not recall seeing Mr. Koehn fall to the rig floor. On cross-examination, Benson stated that it was the responsibility of the drilling crew on the rig floor,
especially the driller, to tell the CST operator to speed up or slow down. Finally, Benson stated that
Key rarely had safety meetings before starting a shift, and that the driller was responsible for
enforcing safety matters on the rig.

 San Miguel, the driller, testified that he saw Mr. Koehn get struck by the pipe. He
said that the "[CST] operator, an inexperienced operator at that point, throttled it forward, which
caused the drill pipe to hit [Mr. Koehn] across the right shoulder, twisting him, throwing him back
against the derrick leg." San Miguel said that, because the trough had several times been run into
the snub pole, he stopped the operation and went down to talk to the operator and flagged the dead
line, all of which he did before Mr. Koehn was actually struck by the pipe. According to San
Miguel, the CST operator operated the machinery in an "unsafe" and "reckless" manner. Unlike
Benson, San Miguel testified that as the driller, he had no control over the speed at which the pipe
was raised to the rig floor. Only the operator had control over that. San Miguel testified that he and
Mr. Koehn always attended the safety meetings.

 The Koehns argue that because everyone who witnessed the events testified
consistently and unanimously that the CST operator was operating in an unsafe manner that was
"calculated to cause injury," there is no contradictory evidence regarding what actually happened. 
Thus, the jury completely disregarded undisputed evidence, and in so doing, rendered a verdict
contrary to the overwhelming weight and preponderance of the evidence. See Murphy v. Fannin
County Elec. Coop., Inc., 957 S.W.2d 900, 907 (Tex. App.--Texarkana 1997, no pet.); Caterpillar
Tractor Co. v. Cropper, 767 S.W.2d 813, 815 (Tex. App.--Texarkana 1989, writ denied). We
disagree. Although Mr. Koehn and the eyewitnesses to the incident all testified that the CST
operator "throttled" the trough in an unsafe manner, causing it to ram into Mr. Koehn, the jury was
not bound by that testimony.

 The jury heard enough inconsistencies and contradictions as to other details of the
incident that the credibility of Mr. Koehn and the eyewitnesses could be called into question. For
example, the testimony varied at least to some degree on whether: (1) the trough hit the elevator
latches or the snub pole; (2) Mr. Koehn was injured before or after San Miguel shut down the
operation to speak with the CST operator; (3) the CST operator received proper signaling or
flagging; (4) the speed of the pickup-and-laydown operation was controlled by the CST operator or
the driller and the crew on the rig floor; (5) Mr. Koehn was actually physically struck by the pipe; (3)
and (6) whether Mr. Koehn and San Miguel routinely attended safety meetings. These internal
conflicts served to undermine the credibility of Mr. Koehn and the eyewitnesses. Thus, the jury had
the prerogative to disbelieve any and all of these witnesses, even if their specific testimony as to the
manner in which the pickup-and-laydown machine was operated was entirely uncontradicted. See
Rivas v. Garibay, 974 S.W.2d 93, 96 (Tex. App.--San Antonio 1998, pet. denied) (citing Barrajas
v. VIA Metro. Transit Auth., 945 S.W.2d 207, 209 (Tex. App.--San Antonio 1997, no writ)). 

 CST also directly attacked the credibility of these witnesses and attempted to ascribe
to them motives for misrepresenting the facts. Michael Smith, a petroleum engineer who had
considerable experience supervising work on a rig floor during a pickup-and-laydown operation,
testified as CST's expert. After reviewing the witnesses' deposition testimony, drilling records, and
models of the rig floor, Smith opined that if Mr. Koehn stood where he said he was standing, the
pipe could not have reached him. Therefore, to be struck by the pipe, Mr. Koehn must have been
standing in front of the well hole, which in Smith's expert opinion was improper and unsafe. 
According to Smith, the members of the drilling crew might seek to cover up that fact because "there
was talk about losing their safety bonuses and, you know, all these hands on the rig they're--they're
compadres, they--they get to know each other real well out there and I'm sure they didn't want
to--didn't want to bring it upon themselves that they had messed up." Also, because San Miguel
had the responsibility to train Mr. Koehn, and yet the two skipped out on safety meetings together,
it would especially "look bad for Mr. San Miguel if it was found out that Mr. Koehn was in the
wrong place."

 Nor did the testimony of Mr. Koehn and the drilling crew members regarding whether
the CST operator unsafely throttled or gunned the trough go entirely undisputed, as the Koehns
maintain. The Koehns called Randy Gibson, the district manager for CST, to testify as an adverse
expert witness. Gibson admitted that gunning or ramming the trough at the rig floor while Mr.
Koehn attempted to latch the pipe would be an "unsafe" operation of the pickup-and-laydown
machine. However, he vigorously maintained that--based on his assessment of the eyewitness
deposition testimony--he did not believe that the CST operator operated the machinery in a
negligent manner on the night in question. There was evidence that the operation went on for some
time before the drilling crew adjusted the lights on the rig floor for the CST operator and started
flagging him. Based on his review of that evidence, Gibson opined that the drilling crew appeared
inexperienced and therefore could have mischaracterized CST's operation as being unsafe.

 Based on our review of the evidence, we reject the Koehns' argument that the jury's
failure to find negligence on the part of CST squarely conflicts with the holding in Caterpillar
Tractor Company, in which the court of appeals stated:


[T]he jury may disbelieve evidence which is contradicted; but to completely
disregard undisputed evidence and admissions in favor of general conclusory
statements denying negligence, and thereby find a complete lack of negligence, is to
go against the overwhelming weight and preponderance of the evidence.


 We are not judging the credibility of witnesses. We are judging undisputed
evidence and admissions which, despite Cropper's generalized statements that he
looked for the track, show that he deliberately chose not to use several means
available to him which would have enabled him to see the track and avoid running
into it. The overwhelming weight of the evidence shows this, even assuming as true
his evidence concerning the vehicle's visual obstructions. 



767 S.W.2d at 815. The Koehns' reliance on this language is misplaced. The Koehns certainly
never elicited an admission that would show that the CST operator deliberately gassed or throttled
the trough in an unsafe manner. Gibson's testimony contended that the drilling crew did not have
the experience to recognize whether the trough was gassed or throttled in an unsafe manner. Further,
Cropper is not on point because there it was undisputed that the plaintiff, who was injured when he
drove a tractor over a folded metal backhoe track, was in sole control of the operation of the tractor. 
Here, there was evidence that the operator of a pickup-and-laydown machine depends on signals
from the drilling crew. Thus, even if the evidence that the CST operator gassed or throttled the
trough went largely undisputed, it fails to establish CST's negligence if we assume as true the
evidence that the drilling crew failed to adequately signal CST's operator. (4)

 Although Mr. Koehn and his fellow members of the drilling crew testified that they
believed the trough was raised in an erratic manner and unsafely throttled towards Mr. Koehn while
he attempted to latch the pipe with the elevators, the jury as fact-finder is the sole judge of the
witnesses' credibility and the weight to be given their testimony. Simons v. City of Austin, 921
S.W.2d 524, 531 (Tex. App.--Austin 1996, writ denied). Also, a jury's failure to find a fact vital
to recovery need not be supported by affirmative evidence. Traylor v. Goulding, 497 S.W.2d 944,
945 (Tex. 1973). After reviewing the competing testimony and other evidence, a reasonable jury
could have believed the testimony of Gibson that the drilling crew was inexperienced or not
attendant to their safety duties, and therefore incapable of recognizing an unsafe operation of the
pickup-and-laydown machine. The jury could have believed that, even if the trough was raised in
an erratic manner and throttled, the drilling crew had the responsibility to carefully direct the pickup-and-laydown machine operator and that the occurrence was proximately caused by CST's operator
not receiving accurate signals from the drilling crew. The jury could have believed that Mr. Koehn
stood in the wrong place on the rig floor and that this mistake proximately caused his injury. We
hold that the jury's failure to find CST negligent was not so contrary to the overwhelming weight
and preponderance of the evidence as to be clearly wrong and manifestly unjust. We overrule the
Koehns' first issue.


Challenge to the Jury's Finding that Mr. Koehn was Negligent

 In their second issue, the Koehns contend that there was insufficient evidence to
support the jury's finding that Mr. Koehn's negligence proximately caused the occurrence. 
However, it is unnecessary to decide this insufficient evidence challenge in view of our holding that
the jury's refusal to find CST negligent is not contrary to the great weight and preponderance of the
evidence. See Brown v. Gonzalez, 653 S.W.2d 854, 862 (Tex. App.--San Antonio 1983, no writ)
(citing Caughman v. Glaze, 412 S.W.2d 357, 362 (Tex. Civ. App.--San Antonio 1967, writ ref'd
n.r.e.)). A finding that CST was not negligent rendered Mr. Koehn's negligence immaterial. "Even
if we should conclude that there was no evidence to support such findings, there would be no basis
for the rendition of a judgment other than that entered by the court below." Id. (citing Caughman,
412 S.W.2d at 362).

 The Koehns assert that, because "the jury did not find Key negligent (but the jury
wrongfully attributed Key's negligence to [Mr.] Koehn), the failure to find CST negligent cannot be
supported by the record." The Koehns seem to argue that because the thrust of CST's defense at trial
was that Key was the sole cause of the occurrence, a finding of negligence on the part of Mr. Koehn
rather than a finding that Key was the sole proximate cause necessarily demonstrates that the jury
was confused and thereby wrongfully imputed Key's negligence to Mr. Koehn. See Varela, 658
S.W.2d at 562; Lee, 880 S.W.2d at 753. However, our review of the record reveals that throughout
the trial CST defended on alternate theories, and sought to present some evidence by which the jury
could have believed that Mr. Koehn, rather than Key, was negligent. (5) Moreover, we could only
question whether potential jury confusion over the sole proximate cause issue resulted in harm if the
jury had assigned some negligence to CST in Question Number One, and some percentage of
responsibility to CST in Question Number Two. See Lozano v. H.D. Indus., Inc., 953 S.W.2d 304,
319 (Tex. App.--El Paso 1997, no pet.). (6) However, the jury assigned no negligence, and zero
responsibility, to CST. Thus, we reject the Koehns' suggestion that CST's alternate defense theories
at trial somehow caused the jury to improperly fail to find CST negligent. We overrule the Koehns'
second issue.


CONCLUSION


 Considering all the evidence in the record, we conclude that the jury's findings are
not against the great weight of the evidence and are not manifestly unjust. The judgment of the
district court is affirmed.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: May 22, 2003
1. To be precise, Mr. Koehn was hired by Dawson Production Services, which by the time
of the incident in question had been bought by Key.
2. Like Mr. Koehn, the others on the drilling crew were all employed by Key. 
3. It is worth noting that Robert San Miguel testified that on the night of the incident he called
Abe Zamora, the rig supervisor, woke him up, and informed him that Mr. Koehn had been struck by
the pipe. However, according to Abe Zamora's testimony, San Miguel did not contact him until the
following day. Furthermore, he learned from San Miguel only that "when [Mr. Koehn] was trying
to latch the pipe . . . he kind of just jerked his back. Nobody told me that the pipe had actually hit
him."
4. The Koehns also rely on John Roberts, Inc. v. Bookstall, Inc., 538 S.W.2d 473 (Tex. Civ.
App.--Austin 1976, writ ref'd n.r.e.), which is inapposite to the current situation. There, the
appellant sued on an open account and a promissory note executed by Bookstall and guaranteed by
C.A. Austin. Id. at 474. This Court held that the jury's answer of "none" to a special issue which
asked what sum of money appellees owed on the open account was contrary to the great weight and
preponderance of the evidence because of certain admissions of liability made by the guarantor. Id.
at 475. In the case before us, CST never made such a crucial admission.
5. For example, the jury heard testimony that Mr. Koehn was negligent for standing in the
wrong place and not moving despite being repeatedly jarred by the trough until finally he was
knocked down. Also, the jury heard testimony that Mr. Koehn often skipped important safety
meetings. 
6. In Lozano v. H.D. Industries, Inc., the defendant was entitled to a jury question as to
whether the conduct of the plaintiff's subscribing employer constituted the sole proximate cause of
the plaintiff's injuries, but the court of appeals concluded that the trial court erred by submitting
questions to the jury requiring the assignment of negligence and a percentage of responsibility to the
subscribing employer. 953 S.W.2d 304, 318 (Tex. App.--El Paso 1997, no pet.). Nonetheless, the
error was held harmless because the jury's responses with respect to the wrongly submitted party
were irrelevant in light of the fact that the jury had already assigned no responsibility to the
defendant. Id. at 319 (citing City of Brownsville v. Alvarado, 897 S.W.2d 750 (Tex. 1995)).