# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00322-CV

**Darrell Koehn and Joanne Koehn, Appellants**

**v.**

**CST Drilling Fluids, Inc. Individually and d/b/a Starvin Marvin, Appellee**

### FROM THE DISTRICT COURT OF LEE COUNTY, 335TH JUDICIAL DISTRICT
### NO. 11, 521, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Darrell Koehn and Joanne Koehn appeal from a take-nothing judgment entered against them in their suit to recover for personal injuries and loss of consortium. Mr. Koehn allegedly sustained back injuries when he was struck by heavy equipment during a pickup-and-laydown operation on the floor of a drilling rig. The Koehns sued CST Drilling Fluids, Inc. d/b/a Starvin Marvin (ACST@), the operator of the pickup-and-laydown machine used in the operation. The jury failed to find negligence on the part of CST, finding instead that Mr. Koehn=s negligence was the proximate cause of the accident. In two issues,

the Koehns contend that there is factually insufficient evidence to support the jury=s findings. We will affirm the district court=s judgment.

## BACKGROUND

Mr. Koehn worked as a floor hand for Key Energy Group (AKey@), which had hired him to work on a drilling crew in early September 1997.[1] On the night of November 9, 1997, the drilling crew was engaged in a pickup-and-laydown operation on a well site. A pickup-and-laydown operation consists of transporting joints of pipe from racks on the ground to the rig floor, twenty feet above, and then running the drilling pipe into a well hole. On that occasion, CST had been hired as the pickup-and-laydown company. CST=s operators were responsible for lifting the pipe to the rig floor by placing the joints of pipe into a trough that was moved up on cables using a motorized wench called a pickup-and-laydown machine. The wench was set up using a Asnub pole,@ which is installed in a hole in the rig floor called the Amouse hole.@ Once raised to the rig floor, the pipe is secured by latching Aelevators@ around it. The elevators are used to transport the pipe to the top of the derrick so that the bottom of the pipe segment can be connected to the joint of pipe already in the well hole.

---

[1] To be precise, Mr. Koehn was hired by Dawson Production Services, which by the time of the incident in question had been bought by Key.

On the night of the incident, Mr. Koehn stood on the rig floor to latch the elevators around the pipe once it reached the rig floor. According to Mr. Koehn, the CST pickup-and-laydown machine operator raised the pipe in an erratic manner, often Agassing@ or Athrottling@ the trough up to the rig floor; after a number of such instances, a joint of pipe struck him in the shoulder as he attempted to latch it. As a result, Mr. Koehn suffered injuries to his back that eventually required surgery and forced him to leave the oilfield workplace. The other members of the drilling crewCRobert San Miguel, Thomas Rochester, and Rick BensonCwitnessed the incident.[2] The identity of the CST operator on the night of the incident has never been precisely established. There were no other eyewitnesses to the incident.

In November 1999, the Koehns sued both CST and Key; their suit against Key was eventually dismissed because Key subscribed to workers= compensation insurance. The Koehns= negligence suit against CST was tried to a jury in December 2001. CST pleaded an affirmative defense, arguing that the accident was proximately caused in whole or in part by Mr. Koehn=s own negligence, or solely caused by the negligence of Key. The jury heard testimony regarding the incident from Mr. Koehn, the drilling crew witnesses, the rig supervisor, and several experts. The jury also heard testimony relating to the severity and consequences of Mr. Koehn=s back injuries. At the conclusion of trial, CST was precluded from submitting a jury question regarding Key=s conduct because Key provided workers=compensation benefits to Mr. Koehn prior to trial. *See* Texas Workers=Compensation Act, Tex. Lab. Code Ann. ' 406.034 (West 1996); *Varela v. American Petrofina Co. of Tex.*, 658 S.W.2d 561, 562 (Tex. 1983). Rather, CST presented evidence of Key=s negligence during the trial and received an instruction on Asole

---

[2] Like Mr. Koehn, the others on the drilling crew were all employed by Key.

proximate cause.@ *See Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750, 753 (Tex. 1993). The jury received instructions on how to answer the proximate cause question: they could answer Ayes@ or Ano@ for CST and Darrell Koehn, but if the jury considered Key to be the sole proximate cause, then they were required to answer Ano@ as to both CST and Darrell Koehn. The jury answered Ano@ as to CST, and Ayes@ as to Mr. Koehn. The district court entered take-nothing judgment against the plaintiffs and later denied their motion for new trial. This appeal followed.

**DISCUSSION**

*Challenge to the Jury=s Failure to Find Negligence*

In their first issue, the Koehns appeal the district court=s denial of their motion for new trial by challenging the factual sufficiency of the evidence supporting the jury=s failure to find that CST=s negligence proximately caused Mr. Koehn=s injuries. A challenge to the factual sufficiency of the evidence requires the party with the burden of proof to establish on appeal that the non-finding is contrary to the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer. *See Waring v. Wommack*, 945 S.W.2d 889, 893 (Tex. App.CAustin 1997, no pet.) (citing *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988)). Rather, we will reverse the judgment and remand for a new trial only if, after reviewing all the evidence in the record, we conclude that the failure to find is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *Dow Chem.*, 46 S.W.3d at 242; *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Here, the jury was not convinced by a

4

preponderance of evidence that CST=s negligence proximately caused Mr. Koehn=s injuries; having reviewed all of the evidence, we find it factually sufficient to support the jury=s finding.

Mr. Koehn testified that on the night of the incident he attempted to latch joints of pipe to the elevators as they were raised to the rig floor in the trough, but had trouble doing so because the CST operator worked the pickup-and-laydown machine in an erratic manner. Mr. Koehn described how Tommy Rochester, also a floor hand on the drilling crew, gave hand signals to the CST operator so as to slowly and smoothly ease the pipe into the elevator. However, the CST operator allegedly raised the trough too quickly, causing the trough and pipe to hit the snub pole. Then the CST operator throttled the trough into the elevator while Mr. Koehn attempted to make the latch. According to Mr. Koehn=s testimony on direct examination, this throttling into the elevator occurred approximately eight to ten instances, each time causing the elevator to jar him backwards. Robert San Miguel, the Adriller@ on the crew, allegedly shut down the operation and spoke to the CST operator before Mr. Koehn was physically hit, but after he had been jarred by the elevator. San Miguel also Aflagged the dead line@ to provide a visual aid to the CST operator indicating how far to raise the elevator before stopping. Mr. Koehn testified that after the operation resumed, the trough was throttled into the elevator so erratically that the pipe finally struck Mr. Koehn across the chest, knocking him to the rig floor.

On cross-examination, CST sought to contradict Mr. Koehn with his deposition testimony from two years earlier. For example, Mr. Koehn testified in his deposition that the trough hit the elevator latches, but agreed on cross-examination that the trough can physically only hit the snub pole. He testified in his deposition that the trough is raised in one continuous motion into the elevator latches. Mr. Koehn also

read from his deposition, where he had testified that on the occasion in question no one on the rig floor signaled or flagged the CST operator and that the pipe never actually physically hit him. Mr. Koehn admitted on cross-examination that he rarely attended safety meetings; he admitted that signaling the pickup-and-laydown operator would be the safe thing to do, but that, on the night of the incident, he was jarred up to maybe ten times before the operation was shut down so that guidance could be provided to the CST operator.

The jury heard deposition testimony from the members of the drilling crew, the only eyewitnesses to the incident. Tommy Rochester, the motor man, testified that the CST operator was Arunning@ the trough Aup in there@ so that the elevators were pushed back, thereby causing Mr. Koehn to be pushed back. According to Rochester, San Miguel, the driller, shut the rig down and informed the CST operator that he needed to be flagged in. Rochester never testified that Mr. Koehn was knocked down after San Miguel spoke with the CST operator; rather, he testified that the CST operator was subject to the control of the driller and the tool pusher and that before Mr. Koehn was injured no one had talked to the CST operator. Rochester also testified that Mr. Koehn and San Miguel would often arrive at the safety meetings, but would sign their names and leave without watching the safety videotape.

The other floor hand, Rick Benson, testified that he witnessed Mr. Koehn get struck with the pipe. Benson recalled that Rochester had Ahollered@ at the CST operator when he did not operate at normal speeds and Agassed it too much,@ causing the trough to ram into Mr. Koehn and spin him around. Benson did not recall seeing Mr. Koehn fall to the rig floor. On cross-examination, Benson stated that it was the responsibility of the drilling crew on the rig floor, especially the driller, to tell the CST operator to

**6**

speed up or slow down.  Finally, Benson stated that Key rarely had safety meetings before starting a shift, and that the driller was responsible for enforcing safety matters on the rig.

San Miguel, the driller, testified that he saw Mr. Koehn get struck by the pipe.  He said that the A[CST] operator, an inexperienced operator at that point, throttled it forward, which caused the drill pipe to hit [Mr. Koehn] across the right shoulder, twisting him, throwing him back against the derrick leg.@ San Miguel said that, because the trough had several times been run into the snub pole, he stopped the operation and went down to talk to the operator and flagged the dead line, all of which he did before Mr. Koehn was actually struck by the pipe.  According to San Miguel, the CST operator operated the machinery in an Aunsafe@ and Areckless@ manner.  Unlike Benson, San Miguel testified that as the driller, he had no control over the speed at which the pipe was raised to the rig floor.  Only the operator had control over that.  San Miguel testified that he and Mr. Koehn always attended the safety meetings.

The Koehns argue that because everyone who witnessed the events testified consistently and unanimously that the CST operator was operating in an unsafe manner that was Acalculated to cause injury,@ there is no contradictory evidence regarding what actually happened.  Thus, the jury completely disregarded undisputed evidence, and in so doing, rendered a verdict contrary to the overwhelming weight and preponderance of the evidence.  *See Murphy v. Fannin County Elec. Coop., Inc.*, 957 S.W.2d 900, 907 (Tex. App.CTexarkana 1997, no pet.); *Caterpillar Tractor Co. v. Cropper*, 767 S.W.2d 813, 815 (Tex. App.CTexarkana 1989, writ denied).  We disagree.  Although Mr. Koehn and the eyewitnesses to the incident all testified that the CST operator Athrottled@ the trough in an unsafe manner, causing it to ram into Mr. Koehn, the jury was not bound by that testimony.

7

The jury heard enough inconsistencies and contradictions as to other details of the incident that the credibility of Mr. Koehn and the eyewitnesses could be called into question. For example, the testimony varied at least to some degree on whether: (1) the trough hit the elevator latches or the snub pole; (2) Mr. Koehn was injured before or after San Miguel shut down the operation to speak with the CST operator; (3) the CST operator received proper signaling or flagging; (4) the speed of the pickup-and-laydown operation was controlled by the CST operator or the driller and the crew on the rig floor; (5) Mr. Koehn was actually physically struck by the pipe;[3] and (6) whether Mr. Koehn and San Miguel routinely attended safety meetings. These internal conflicts served to undermine the credibility of Mr. Koehn and the eyewitnesses. Thus, the jury had the prerogative to disbelieve any and all of these witnesses, even if their specific testimony as to the manner in which the pickup-and-laydown machine was operated was entirely uncontradicted. *See Rivas v. Garibay*, 974 S.W.2d 93, 96 (Tex. App.CSan Antonio 1998, pet. denied) (citing *Barrajas v. VIA Metro. Transit Auth.*, 945 S.W.2d 207, 209 (Tex. App.CSan Antonio 1997, no writ)).

CST also directly attacked the credibility of these witnesses and attempted to ascribe to them motives for misrepresenting the facts. Michael Smith, a petroleum engineer who had considerable

---

[3] It is worth noting that Robert San Miguel testified that on the night of the incident he called Abe Zamora, the rig supervisor, woke him up, and informed him that Mr. Koehn had been struck by the pipe. However, according to Abe Zamora=s testimony, San Miguel did not contact him until the following day. Furthermore, he learned from San Miguel only that Awhen [Mr. Koehn] was trying to latch the pipe . . . he kind of just jerked his back. Nobody told me that the pipe had actually hit him.@

experience supervising work on a rig floor during a pickup-and-laydown operation, testified as CST=s expert. After reviewing the witnesses= deposition testimony, drilling records, and models of the rig floor, Smith opined that if Mr. Koehn stood where he said he was standing, the pipe could not have reached him. Therefore, to be struck by the pipe, Mr. Koehn must have been standing in front of the well hole, which in Smith=s expert opinion was improper and unsafe. According to Smith, the members of the drilling crew might seek to cover up that fact because Athere was talk about losing their safety bonuses and, you know, all these hands on the rig they=reCthey=re compadres, theyCthey get to know each other real well out there and I=m sure they didn=t want toCdidn=t want to bring it upon themselves that they had messed up.@ Also, because San Miguel had the responsibility to train Mr. Koehn, and yet the two skipped out on safety meetings together, it would especially Alook bad for Mr. San Miguel if it was found out that Mr. Koehn was in the wrong place.@

Nor did the testimony of Mr. Koehn and the drilling crew members regarding whether the CST operator unsafely throttled or gunned the trough go entirely undisputed, as the Koehns maintain. The Koehns called Randy Gibson, the district manager for CST, to testify as an adverse expert witness. Gibson admitted that gunning or ramming the trough at the rig floor while Mr. Koehn attempted to latch the pipe *would* be an Aunsafe@ operation of the pickup-and-laydown machine. However, he vigorously maintained thatCbased on his assessment of the eyewitness deposition testimonyChe did not believe that the CST operator operated the machinery in a negligent manner on the night in question. There was evidence that the operation went on for some time before the drilling crew adjusted the lights on the rig floor for the CST

operator and started flagging him. Based on his review of that evidence, Gibson opined that the drilling crew appeared inexperienced and therefore could have mischaracterized CST=s operation as being unsafe.

Based on our review of the evidence, we reject the Koehns= argument that the jury=s failure to find negligence on the part of CST squarely conflicts with the holding in *Caterpillar Tractor Company*, in which the court of appeals stated:

> [T]he jury may disbelieve evidence which is contradicted; but to completely disregard undisputed evidence and admissions in favor of general conclusory statements denying negligence, and thereby find a complete lack of negligence, is to go against the overwhelming weight and preponderance of the evidence.
> We are not judging the credibility of witnesses. We are judging undisputed evidence and admissions which, despite Cropper=s generalized statements that he looked for the track, show that he deliberately chose not to use several means available to him which would have enabled him to see the track and avoid running into it. The overwhelming weight of the evidence shows this, even assuming as true his evidence concerning the vehicle=s visual obstructions.

767 S.W.2d at 815. The Koehns= reliance on this language is misplaced. The Koehns certainly never elicited an admission that would show that the CST operator deliberately gassed or throttled the trough in an unsafe manner. Gibson=s testimony contended that the drilling crew did not have the experience to recognize whether the trough was gassed or throttled in an unsafe manner. Further, *Cropper* is not on point because there it was undisputed that the plaintiff, who was injured when he drove a tractor over a folded metal backhoe track, was in sole control of the operation of the tractor. Here, there was evidence that the operator of a pickup-and-laydown machine depends on signals from the drilling crew. Thus, even if the evidence that the CST operator gassed or throttled the trough went largely undisputed, it fails to establish

**10**

CST=s negligence if we assume as true the evidence that the drilling crew failed to adequately signal CST=s operator.[4]

Although Mr. Koehn and his fellow members of the drilling crew testified that they believed the trough was raised in an erratic manner and unsafely throttled towards Mr. Koehn while he attempted to latch the pipe with the elevators, the jury as fact-finder is the sole judge of the witnesses= credibility and the weight to be given their testimony. *Simons v. City of Austin*, 921 S.W.2d 524, 531 (Tex. App.CAustin 1996, writ denied). Also, a jury=s failure to find a fact vital to recovery need not be supported by affirmative evidence. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973). After reviewing the competing testimony and other evidence, a reasonable jury could have believed the testimony of Gibson that the drilling crew was inexperienced or not attendant to their safety duties, and therefore incapable of recognizing an unsafe operation of the pickup-and-laydown machine. The jury could have believed that, even if the trough was raised in an erratic manner and throttled, the drilling crew had the responsibility to carefully direct the pickup-and-laydown machine operator and that the occurrence was proximately caused

---

[4] The Koehns also rely on *John Roberts, Inc. v. Bookstall, Inc.*, 538 S.W.2d 473 (Tex. Civ. App.CAustin 1976, writ ref=d n.r.e.), which is inapposite to the current situation. There, the appellant sued on an open account and a promissory note executed by Bookstall and guaranteed by C.A. Austin. *Id*. at 474. This Court held that the jury=s answer of Anone@ to a special issue which asked what sum of money appellees owed on the open account was contrary to the great weight and preponderance of the evidence because of certain admissions of liability made by the guarantor. *Id*. at 475. In the case before us, CST never made such a crucial admission.

11

by CST=s operator not receiving accurate signals from the drilling crew. The jury could have believed that Mr. Koehn stood in the wrong place on the rig floor and that this mistake proximately caused his injury. We hold that the jury=s failure to find CST negligent was not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. We overrule the Koehns= first issue.

### Challenge to the Jury=s Finding that Mr. Koehn was Negligent

In their second issue, the Koehns contend that there was insufficient evidence to support the jury=s finding that Mr. Koehn=s negligence proximately caused the occurrence. However, it is unnecessary to decide this insufficient evidence challenge in view of our holding that the jury=s refusal to find CST negligent is not contrary to the great weight and preponderance of the evidence. *See Brown v. Gonzalez*, 653 S.W.2d 854, 862 (Tex. App.CSan Antonio 1983, no writ) (citing *Caughman v. Glaze*, 412 S.W.2d 357, 362 (Tex. Civ. App.CSan Antonio 1967, writ ref=d n.r.e.)). A finding that CST was not negligent rendered Mr. Koehn=s negligence immaterial. AEven if we should conclude that there was no evidence to support such findings, there would be no basis for the rendition of a judgment other than that entered by the court below.@ *Id*. (citing *Caughman*, 412 S.W.2d at 362).

The Koehns assert that, because Athe jury did not find Key negligent (but the jury wrongfully attributed Key=s negligence to [Mr.] Koehn), the failure to find CST negligent cannot be supported by the record.@ The Koehns seem to argue that because the thrust of CST=s defense at trial was that Key was the sole cause of the occurrence, a finding of negligence on the part of Mr. Koehn rather than a finding that Key was the sole proximate cause necessarily demonstrates that the jury was confused and thereby wrongfully

imputed Key=s negligence to Mr. Koehn. *See Varela*, 658 S.W.2d at 562; *Lee*, 880 S.W.2d at 753. However, our review of the record reveals that throughout the trial CST defended on alternate theories, and sought to present some evidence by which the jury could have believed that Mr. Koehn, rather than Key, was negligent.[5] Moreover, we could only question whether potential jury confusion over the sole proximate cause issue resulted in harm if the jury had assigned some negligence to CST in Question Number One, and some percentage of responsibility to CST in Question Number Two. *See Lozano v. H.D. Indus., Inc.*, 953 S.W.2d 304, 319 (Tex. App.CEl Paso 1997, no pet.).[6] However, the jury assigned no negligence, and zero responsibility, to CST. Thus, we reject the Koehns= suggestion that CST=s alternate defense theories at trial somehow caused the jury to improperly fail to find CST negligent. We overrule the Koehns= second issue.

**CONCLUSION**

---

[5] For example, the jury heard testimony that Mr. Koehn was negligent for standing in the wrong place and not moving despite being repeatedly jarred by the trough until finally he was knocked down. Also, the jury heard testimony that Mr. Koehn often skipped important safety meetings.

[6] In *Lozano v. H.D. Industries, Inc.*, the defendant was entitled to a jury question as to whether the conduct of the plaintiff=s subscribing employer constituted the sole proximate cause of the plaintiff=s injuries, but the court of appeals concluded that the trial court erred by submitting questions to the jury requiring the assignment of negligence and a percentage of responsibility to the subscribing employer. 953 S.W.2d 304, 318 (Tex. App.CEl Paso 1997, no pet.). Nonetheless, the error was held harmless because the jury=s responses with respect to the wrongly submitted party were irrelevant in light of the fact that the jury had already assigned no responsibility to the defendant. *Id*. at 319 (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750 (Tex. 1995)).

Considering all the evidence in the record, we conclude that the jury=s findings are not against the great weight of the evidence and are not manifestly unjust. The judgment of the district court is affirmed.

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   May 22, 2003